UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X

PHILBERT GORRCIK,

                                        Plaintiff,            Index # 07 CV 2529 (GBD)

                -against-                                     **NOTICE OF MOTION TO
                                                             DISMISS**
NEW YORK CITY TRANSIT AUTHORITY,

                                        Defendant.

-----------------------------------------------------------------X

To:    Stuart Lichten, Esq.
       113 University Place, 11th Floor
       New York, New York 10003
       *Attorney for Plaintiff*

               PLEASE TAKE NOTICE that, based on the Complaint, the attached declaration

of Ann Burton Goetcheus (with its exhibits), and the prior proceedings herein, the Defendant

NYCTA will move this Court (Daniels, J.) at a time to be selected by the Court, for an order

dismissing, under Rule 12(b)(1) or 12(b)(6) of the Federal Rules of Civil Procedure, all claims in

the Complaint against Defendant the New York Transit Authority.  The grounds for this motion,

which grounds are set out in detail in the accompanying memorandum, are that Plaintiff has

failed to state claims upon which relief can be granted.

               PLEASE TAKE FURTHER NOTICE that any papers in opposition to this motion

shall be served within 20 days.

Dated:  May 25, 2007

                                        Yours, etc.

                                        *Ann Burton Goetcheus*

                                        Ann Burton Goetcheus (AG 7265)
                                        Office of the General Counsel
                                        New York City Transit Authority
                                        130 Livingston Street (12th Floor)
                                        Brooklyn, NY  11201
                                        Tel. [718] 694-3889
                                        *Attorneys for Defendant*

#971406

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------ x

PHILBERT GORRICK,

    Plaintiff,

       - against -

NEW YORK CITY TRANSIT AUTHORITY

    Defendant.

------------------------------------------------------------

    :     **DECLARATION OF**
         **ANN BURTON**
    :     **GOETCHEUS IN**
         **SUPPORT OF**
    :     **DEFENDANT'S**
         **MOTION TO DISMISS**

    x     **CV-07-2529 (GBD)**

**ANN BURTON GOETCHEUS,** pursuant to 28 U.S.C. § 1746, declares:

1.    I am an attorney who represents the Defendant in this action.  I submit this declaration in support of the Defendant's motion, under Fed.R.Civ.P. Rules 12(b)(1) and (6), to dismiss all causes of action in the Complaint in this action as untimely pursuant to the terms of the Americans with Disabilities Act, 42 U.S.C. §§ 12117(a), 2000e-5(e) and (f), and pursuant to the terms of the New York State and New York City Human Rights Laws, NY CPLR § 214(2); NYC Admin. Code § 8-502 (d).  Defendant further moves to dismiss the cause of action under the New York City Human Rights Law on the ground that that law is not applicable to the Defendant pursuant to the New York Public Authorities Law § 1288(8) and because, under New York State law, punitive damages, otherwise available under the NYCHRL, cannot be assessed against a public benefit corporation, such as the Transit Authority.

2.    A copy of the Complaint, dated March 26, 2007, is annexed hereto as Exhibit A.

3.    The Complaint at ¶ 12 refers to arbitration proceedings concerning the instant matter between Plaintiff's union, the Transport Workers Union ("TWU"), and

Defendant but fails to attach the related decisions. Copies of the Arbitration Opinion and Award of April 2002 is annexed hereto as Exhibit B and that of July 2006 as Exhibit C.

4.      The Complaint, at ¶13, refers to the Defendant's medical examination on or about August 16, 2006 but fails to attach the documentation. Attached as Exhs. D and E are documents concerning this medical examination, Exhibit D is a letter from Evette Vargas, Director, Labor Relations/MOW, to Plaintiff concerning the appointment for the examination and Exhibit E is a Memorandum from M. Santarpia, General Superintendent, Cable, to Stephen Perez, Manager, MOW Office of Employee Support and Safety concerning Plaintiff's restricted work status and lack of work available, with Plaintiff's acknowledgement of receipt.

5.      The Arbitration Opinion and Award dated July 2006, Exh. C, referenced the opinion of Dr. Jennifer Svahn, Plaintiff's treating physician. Dr. Svahn's letter memorializing that opinion is appended as Exhibit F.

6.      Plaintiff's EEOC Charge filed August 10, 2006 is appended as Exhibit G.

7.      The Right-to-Sue letter dated March 22, 2007, that was issued by the EEOC is appended as Exhibit H.

8.      In light of an amendment to New York Public Authorities Law § 1266(8) effective May 15, 2000, which amendment added the Transit Authority to the group of entities exempted by that section from the reach of legal legislation affecting the activities or operations of those entities, my office – I am employed in the Office of the General Counsel of the Transit Authority -- began informing the New York City Commission on Human Rights that that amendment deprived that Commission of

jurisdiction to enforce the Administrative Code of the City of New York against the Transit Authority. The City Commission appears to have agreed and has issued numerous Notices of Administrative Closure in which the City Commission announced that, because of that amendment, it lacked jurisdiction to enforce the Administrative Code against the Transit Authority.

9.    Copies of the non-published Notices of Administrative Closure from the N.Y.C. Commission on Human Rights that are referenced in the Memorandum of Law, *Pinkston v. N.Y.C. Transit Auth.*, Cmplt. No. M-E-AR-01-1010596-E (March 7, 2002); Notice of Administrative Closure, N.Y.C. Commission on Human Rights, *Aronica v. N.Y.C. Transit Auth.*, Cmplt. No. M-E-AD-01-1010481-D (March 7, 2002); Notice of Administrative Closure, N.Y.C. Commission on Human Rights, *Gethers v. N.Y.C. Transit Auth.*, Cmplt. No. M-E-D-01-1010120-D (March 7, 2002); Notice of Administrative Closure, N.Y.C. Commission on Human Rights, *Lambey v. MTA New York City Transit Auth.*, Cmplt. No. M-E-LR-01-1011050-E (March 7, 2002) are attached as Exhibit I hereto.

Executed at Brooklyn, New York, this 25th day of May, 2007, subject to the penalties of perjury.

Ann Burton Goetcheus

# EXHIBIT A

NOTICE OF LAWSUIT AND REQUEST FOR WAIVER OF SERVICE OF SUMMONS

TO:   Ann Burton Goetcheus
      Executive Agency Counsel
      N.Y.C. Transit Authority
      130 Livingston Street
      Brooklyn, New York  11201

      A lawsuit has been commenced against the entity on whose behalf you are addressed.  A copy of the complaint is attached to this notice.  It has been filed in the United States District Court for the Southern District of New York and has been assigned docket number 07 Civ. 2529 (GBD)(AJP).

      This is not a formal summons or notification from the court, but rather my request that you sign and return the enclosed waivers of service in order to save the costs of serving you with a judicial summons and an additional copy of the complaint.  The cost of service will be avoided if I receive a signed copy of the waivers within 30 days after the date designated below as the date on which this Notice and Request is sent.  I enclose a stamped and addressed envelope for your use.  An extra copy of each waiver is also attached for your records.

      If you comply with this request and return the signed waivers, they will be filed with the court and no summons will be served on you.  The action will then proceed as if you had been served on the date the waivers are filed, except that you will not be obligated to answer the complaint before 60 days from the date designated below as the date on which this notice is sent.

      If you do not return the signed waivers within the time indicated, I will take appropriate steps to effect formal service in a manner authorized by the Federal Rules of Civil Procedure and will then, as authorized by those Rules, ask the court to require you and the party on whose behalf you are addressed to pay the full costs of such service.  In that connection, please read the statement concerning the duty of parties to waive the service of the summons, which is set forth at the foot of the waiver forms.

      I affirm that this request is being sent to you on behalf of the plaintiff, this 28th day of March, 2007.

                              _____
                              Stuart Lichten
                              SCHWARTZ, LICHTEN & BRIGHT, P.C.
                              Attorneys for Plaintiff
                              113 University Place, 11th Floor
                              New York, New York  10003
                              (212) 228-6320

WAIVER OF SERVICE OF SUMMONS

TO:  Stuart Lichten
     SCHWARTZ, LICHTEN & BRIGHT, P.C.
     113 University Place – 11th Floor
     New York, New York  10003

     I acknowledge receipt of your request that I waive service of
a summons in the action of <u>Gorrick v. New York City Transit
Authority</u>, which is case number 07 Civ. 2529 (GBD)(AJP) in the
United States District Court for the Southern District.   I have
also received a copy of the complaint in the action, two copies of
this instrument, and a means by which I can return the signed
waiver to you without cost to me.

     I agree to save the cost of service of a summons and an
additional copy of the complaint in this lawsuit by not requiring
that the entity on whose behalf I am acting be served with judicial
process in the manner provided by Rule 4.

     The entity on whose behalf I am acting will retain all
defenses or objections to the lawsuit or to the jurisdiction or
venue of the court except for objections based on a defect in the
summons or in the service of the summons.

     I understand that a judgment may be entered against the party
on whose behalf I am acting if an answer or motion under Rule 12 is
not served upon you within 60 days after March 28, 2007.


Date _____        Signature _____
                            Printed/typed name:_____
                            as_____
                                  of New York City Transit Authority


<u>Duty to Avoid Unnecessary Costs of Service of Summons</u>

<u>Rule 4 of the Federal Rules of Civil Procedure requires certain
parties to cooperate in saving unnecessary costs of service of the
summons and complaint.  A defendant who, after being notified of an
action and asked to waive service of a summons, fails to do so will
be required to bear the cost of such service unless good cause be
shown for its failure to sign and return the waiver.</u>

<u>It is not good cause for a failure to waive service that a party
believes that the complaint is unfounded, or that the action has
been brought in an improper place or in a court that lacks
jurisdiction over the subject matter of the action or even its
person or property.  A party who waives service of the summons
retains all defenses and objections (except any relating to the
summons or to the service of the summons), and may later object to</u>

the jurisdiction of the court or to the place where the action has been brought.

A defendant who waives service must within the time specified on the waiver form serve on the plaintiff's attorney a response to the complaint and must also file a signed copy of the response with the court. If the answer or motion is not served within this time, a default judgment may be taken against the defendant. By waiving service, a defendant is allowed more time to answer then if the summons has been actually served when the request for waiver of service was received.

## WAIVER OF SERVICE OF SUMMONS

TO:   Stuart Lichten
      SCHWARTZ, LICHTEN & BRIGHT, P.C.
      113 University Place - 11th Floor
      New York, New York  10003

I acknowledge receipt of your request that I waive service of a summons in the action of <u>Gorrick v. New York City Transit Authority</u>, which is case number 07 Civ. 2529 (GBD)(AJP) in the United States District Court for the Southern District.  I have also received a copy of the complaint in the action, two copies of this instrument, and a means by which I can return the signed waiver to you without cost to me.

I agree to save the cost of service of a summons and an additional copy of the complaint in this lawsuit by not requiring that the entity on whose behalf I am acting be served with judicial process in the manner provided by Rule 4.

The entity on whose behalf I am acting will retain all defenses or objections to the lawsuit or to the jurisdiction or venue of the court except for objections based on a defect in the summons or in the service of the summons.

I understand that a judgment may be entered against the party on whose behalf I am acting if an answer or motion under Rule 12 is not served upon you within 60 days after March 28, 2007.

| | |
|---|---|
| ‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾ <br> Date | ‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾ <br> Signature <br> Printed/typed name:‾‾‾‾‾‾‾‾‾‾‾ <br> as‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾ <br>      of New York City Transit Authority |

### Duty to Avoid Unnecessary Costs of Service of Summons

<u>Rule 4 of the Federal Rules of Civil Procedure requires certain parties to cooperate in saving unnecessary costs of service of the summons and complaint. A defendant who, after being notified of an action and asked to waive service of a summons, fails to do so will be required to bear the cost of such service unless good cause be shown for its failure to sign and return the waiver.</u>

<u>It is not good cause for a failure to waive service that a party believes that the complaint is unfounded, or that the action has been brought in an improper place or in a court that lacks jurisdiction over the subject matter of the action or even its person or property. A party who waives service of the summons retains all defenses and objections (except any relating to the summons or to the service of the summons), and may later object to</u>

the jurisdiction of the court or to the place where the action has been brought.

A defendant who waives service must within the time specified on the waiver form serve on the plaintiff's attorney a response to the complaint and must also file a signed copy of the response with the court.   If the answer or motion is not served within this time, a default judgment may be taken against the defendant.   By waiving service, a defendant is allowed more time to answer then if the summons has been actually served when the request for waiver of service was received.

**JUDGE DANIELS**

**07 CV 2529**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------X

PHILBERT GORRICK,

       Plaintiff,

  - against -

NEW YORK CITY TRANSIT
AUTHORITY,

       Defendant.

----------------------------------------------------------X

07 Civ.

MAR 2 7 2007

COMPLAINT

CASHIERS

PLAINTIFF DEMANDS
TRIAL BY JURY IN
THIS ACTION

Plaintiff Philbert Gorrick ("Gorrick"), by his attorneys, Schwartz, Lichten & Bright, P.C.,

complains of defendant New York City Transit Authority ("TA"), as follows:

## JURISDICTION AND VENUE

1.  This is an action brought to remedy discrimination in employment on the basis of

disability, in violation of the Americans with Disabilities Act of 1990, as amended, 42 U.S.C.

§ 12101 et seq. ("ADA"); the New York State Human Rights Law, Executive Law § 290 et seq.

("Human Rights Law"); and the Administrative Code of the City of New York, § 8-101 et seq.

("Administrative Code").

2.  Jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 1331, 1343(a)(4), and 1367,

and 42 U.S.C. § 12117(a).

3.  Declaratory and injunctive relief, damages, and other appropriate legal and equitable relief

are sought pursuant to 42 U.S.C. § 12117(a). Compensatory damages are sought pursuant to 42

U.S.C. § 1981a; Executive Law § 297(9); and Administrative Code, § 8-502(a).  Punitive damages are sought pursuant to 42 U.S.C. § 1981a and Administrative Code, § 8-502(a).

4. Costs and attorney's fees are sought pursuant to 42 U.S.C. § 12117(a) and Administrative Code, § 8-502(f).

5. Venue is proper in the Southern District of New York, pursuant to 28 U.S.C. § 1391(b), because the unlawful employment practices occurred within this judicial district.

6. Plaintiff filed a charge of discrimination against defendant with the U.S. Equal Employment Opportunity Commission ("EEOC") on August 10, 2006.  The United States Department of Justice, on March 22, 2007, issued plaintiff a notice informing him of his right to sue defendant.  Plaintiff has fully complied with all prerequisites to jurisdiction in this Court under the ADA.

PARTIES

7. Gorrick has been employed by the TA since July 1991.  His initial position was Power Cable Maintainer Helper, followed by Light Maintainer.  In 1993, the TA promoted Gorrick to Power Cable Maintainer.  He was most recently assigned to the 100 Locust Avenue maintenance center in the Bronx, New York.

8. Defendant is a public authority created under the laws of the State of New York to operate the New York City subway and bus system.

## FACTS

9. For several decades, Gorrick has been diagnosed with severe venous stasis disease, with stasis dermatitis and recurrent ulcers in the ankle region. Due to this disability, Gorrick occasionally has difficulty standing and walking, but he always has been able to perform the essential functions of a Power Cable Maintainer.

10. On October 9, 2000, the TA suspended Gorrick because he was not wearing a certain type of boot. Gorrick was wearing the same type of boot he had worn since he first started working as a Power Cable Maintainer Helper in 1991.

11. Gorrick was unable to wear the boot newly required by the TA because of his disability but Gorrick could perform the essential functions of his job without wearing that boot.

12. Over the next six years, Gorrick, his union, Transport Workers Union of America, Local 100, AFL-CIO, and the TA, attempted to arrive at a reasonable accommodation in various forums, including numerous grievance hearings; nine days of arbitration over four years; and many medical examinations.

13. On August 16, 2006, the TA reached its final medical determination that Gorrick was physically unable to perform the duties of a Power Cable Maintainer, due to his inability to wear the boot required for the first time in October 2000.

## FIRST CAUSE OF ACTION

14. The TA has not allowed Gorrick to return to his position as Power Cable Maintainer because Gorrick has a physical impairment that substantially limits at least two of Gorrick's major

life activities, standing and walking. Defendant therefore discriminated against plaintiff because of his disability. By its acts and practies described above, defendant has violated the ADA.

15. As a result of defendant's discriminatory acts, plaintiff has suffered and will continue to suffer injury unless and until this Court grants relief. Defendant engaged in these discriminatory practices with malice and with reckless indifference to plaintiff's rights protected under federal law.

## SECOND CAUSE OF ACTION

16. By its acts and practices described above, defendant has violated the Human Rights Law.

17. As a result of defendant's discriminatory acts, plaintiff has suffered and will continue to suffer monetary damages and damages for mental anguish and humiliation unless and until this Court grants relief. Defendant willfully and maliciously engaged in these discriminatory practices.

## THIRD CAUSE OF ACTION

18. By its acts and practices described above, defendant has violated the Administrative Code.

19. As a result of defendant's discriminatory acts, plaintiff has suffered and will continue to suffer monetary damages and damages for mental anguish and humiliation unless and until this Court grants relief. Defendant willfully and maliciously engaged in these discriminatory practices.

WHEREFORE, plaintiff respectfully requests that this Court enter a judgment:

## ON THE FIRST CAUSE OF ACTION

(a) declaring that the acts and practices complained of herein are in violation of the ADA;

4

(b)  enjoining and permanently restraining these violations of the ADA;

(c)  directing defendant to take such affirmative action as is necessary to ensure that the effects of these unlawful employment practices are eliminated and do not continue to affect plaintiff's employment opportunities;

(d)  directing defendant to place plaintiff in the position he would have continued to occupy but for defendant's discriminatory treatment of him, and make him whole for all earnings he would have received but for defendant's discriminatory treatment, including but not limited to wages, bonuses, pensions, and other lost benefits;

(e)  directing defendant to pay plaintiff compensatory and punitive damages and damages for his mental anguish and humiliation;

(f)  awarding plaintiff reasonable attorney's fees and the costs of this action;

(g)  granting such other and further relief as this Court deems just and proper;


## ON THE SECOND CAUSE OF ACTION

(h)  awarding compensatory damages in an amount not yet ascertained;


## ON THE THIRD CAUSE OF ACTION

(i)  awarding compensatory and punitive damages in an amount not yet ascertained; and

(j)  awarding plaintiff reasonable attorney's fees and costs of this action;

5

## DEMAND FOR A TRIAL BY JURY

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, plaintiff demands a trial by jury on all of the causes of action herein.

Dated:  New York, New York
       March 26, 2007

SCHWARTZ, LICHTEN & BRIGHT, P.C.

By:  Stuart Lichten (SL-1258)
Attorneys for Plaintiff
113 University Place - 11th Floor
New York, New York  10003
(212) 228-6320

# EXHIBIT B

*ATTACHMENT 1*

NEW YORK CITY TRANSIT
OFFICE OF
LABOR RELATIONS

---------------------------------------------------

| | | |
|---|---|---|
| In the Matter of the Arbitration between | Apr 25 x 9 54 AM '02 | |
| | x | |
| MTA NEW YORK CITY TRANSIT AUTHORITY, | x | |
| | x | |
| Authority, | x | OPINION AND AWARD |
| | x | |
| – and – | x | Re: Mr. Philbert T. Gorrick |
| | x | Pow Cabl M, Pass 330899 |
| TRANSPORT WORKERS UNION, LOCAL 100, | x | DAN 00-2901-0110 |
| | x | |
| | x | |
| Union. | x | |
| | x | |

DEPARTMENT: MOW
---------------------------------------------------

Before:  Tripartite Arbitration Board

Mr. Leonard Postiglione, Employer-designated Board Member
Mr. Michael Jerome, Union-designated Board Member
Margaret Leibowitz, Impartial Chairperson

The above-named Arbitration Board was convened to hear and decide a dispute between the parties under their collective bargaining agreement.

Due notice thereof having been given, hearings in this matter were held on Friday, January 4, and Friday, March 22, 2002 at the MTA, 2 Broadway, New York, N.Y. The Authority was represented by Joel Hornstein, Esq., Labor Attorney. The Union was represented by Kenneth N. Page, Esq., Kennedy, Schwartz & Cure, P.C. The Grievant, Mr. Philbert T. Gorrick, was present at the hearings and testified in his own behalf.

The parties were afforded a full opportunity to present evidence and argument in support of their respective positions. Witnesses were sworn. At the conclusion of the hearings, both parties presented closing arguments and the record was closed. The Arbitration Board met in executive session on Friday, March 29, 2002.

2

## THE CHARGE

Since 10/9/00, you have been unprepared for work in that
you have not reported for work with authorized safety
boots, as required.

## BACKGROUND

The Grievant had been employed by the Authority as a Power Cable Maintainer for nine

years and nine months when he was suspended on October 31, 2000 for reporting to work

without authorized safety boots. He was hired as an Electrical Helper and also worked as a

Light Maintainer. The Grievant was elected a Vice Chairman of the Union in 1995 and served in

that position until 1998.

The Grievant testified that when he was hired in 1991, his medical examination by an

Authority doctor disclosed a chronic varicose vein problem in both legs. (Union Exhibit 3) The

Grievant's personal physician sent a detailed medical report to the Authority stating that he could

walk and stand for eight hours daily, and that he would wear special stockings as he had in his

previous employment. The Grievant testified that he performed all tasks physically required of

him at the Authority.

At the heart of this case is a Track and Structures Policy /Instruction (Number TS 6.50)

concerning "Work Footwear" for all managerial, supervisory and hourly employees engaged in

operations and maintenance work. (Authority Exhibit 1) For hourly employees, an 8-inch plain

toe work boot must meet or exceed standards in four areas, two of which are relevant to this

case: "steel toe or equivalent" and "certified to meet or exceed ANSI Z41.3-PT83, electrical

hazard requirement." Under the parties' collective bargaining agreement, the Authority

periodically provides employees with two pairs of safety shoes at no cost to employees.

3

Superintendent Kevin Fonseca testified that he did not know about the Grievant's medical problem prior to September 21, 1999. On that date, the mobile shoe truck arrived at the Grievant's work location at the 100 Locust Avenue maintenance center to distribute two pairs of safety shoes to each employee and take back his or her old ones. The truck did not have the Grievant's shoe size, 16, in stock. Mr. Fonseca gave the Grievant and other employees special order forms so their shoes could be manufactured for them. In September, a truck drove these employees to Brooklyn to pick up their special order shoes. In March 2000, the Grievant was reassigned to a work location in Brooklyn. In October 2000, Superintendent Valenti telephoned Mr. Fonseca about the Grievant's work shoes. On October 27, Mr. Fonseca telephoned the shoe factory and was told by "Mr. Stan" that messages had been left for the Grievant since the beginning of 2000 to pick up his shoes, but he had not done so.

On cross-examination, Mr. Fonseca testified that from September 1999 through March 2000, he had no problem with the old TA-issued work shoes worn by the Grievant because they were steel-toed and electrically sound. Mr. Fonseca testified that he did not know the Grievant was out of work from November 3 – 14, 1999.

Mr. Saint-Clare Rodney, Superintendent, supervised the Grievant in March 2000 when he worked nights in the 1114 Atlantic Avenue cable section tool and material shop. On Tuesday, March 7, the Grievant wore boots that were not issued by the Authority. He was in Mr. Rodney's office. Mr. Rodney asked if he had permission to wear the boots. The Grievant said, "No." Mr. Rodney suspended him and told him to report to Labor Relations to get approval for his boots due to the fact that he had size and medical problems with TA-issued boots. The Grievant was out of work a week or two, and returned to the tool and material shop wearing the same boots. He had a document from labor relations allowing him to do so, and giving him time

4

to get TA-issued shoes to fit his large feet. He remained in that work assignment replacing an employee on sick leave until September 2000 when the night shift was abandoned.

From March to October 2000, Supervisor Joseph Rozas also supervised the Grievant. He testified that the Grievant had a letter from his doctor that he could not wear work boots because they hurt his feet. On October 9, 2000, Superintendent Valenti told the Grievant and Mr. Rozas that his shoes were not approved by Mr. Richard Gayle from System Safety. The Grievant refused to get new shoes because his old ones were costly. Mr. Valenti suspended him and told him to report to System Safety.

Mr. Gustave Rivera, Director, Maintenance of Way, Office of Employee Support and Safety, testified that Policy/Instruction TS 6.50 contained four requirements for safety boots: (1) steel toe caps that can withstand impact of 75 pounds and 2,500 pounds of pressure, (2) electrical hazard protection, (3) four-grain leather and (4) slip-resistant sole. (Authority Exhibits 1, 2, and 3) The Grievant was in his office on March 20, 2000 with medical documentation from Elmhurst Hospital and a "G46" Authority MAC report to exempt him from wearing TA-issued shoes that caused ulceration of his ankles due to circulatory problems in his feet and legs. The Grievant said he could not wear the shoes. Mr. Rivera handed him "Safety Footwear Reimbursement Guidelines" dated August 12, 1998 and said these were the guidelines for employees who could not wear Transit safety boots due to medical reasons. The guidelines explained that he could buy his own shoes and be reimbursed part of the cost. The Grievant agreed to do so and returned to Mr. Rivera's office a few weeks later with boots. Mr. Rivera examined them and said they lacked steel toes and were not in compliance with TS 6.50 requirements. He asked the Grievant to obtain shoes in compliance with the requirements. On cross-examination, Mr. Rivera stated that the only "equivalent" toe protection for a boot was a composite or fiberglass toe that must also withstand the "2500/75" pounds.

5

Mr. Richard Gayle, Manager of Employee Support and Safety, testified that the Grievant
was in his office on October 9, 2000, referred by his department as to whether his shoes met
Authority safety requirements. Mr. Gayle looked at the Grievant's shoes and told him they
lacked a steel toe or equivalent hard, protective toe covering and electrical hazard standard
substantiation documentation. The Grievant explained his medical condition as the reason for
his shoes.

Superintendent Vincent Valenti coordinates the cable section at Atlantic Avenue. On
October 9, 2000, Supervisor James Lee told Mr. Valenti that the Grievant was not wearing safety
boots. Mr. Valenti called System Safety and sent the Grievant to see Mr. Gayle with his shoes.
Mr. Gayle said the Grievant did not have proper shoes and had had an opportunity since March
to get proper shoes. The Grievant argued that he wanted to wear his own shoes and Mr. Valenti
suspended him.

The Grievant stated that after his election as a Union Vice Chairman, he had a "cordial
relationship with management" at first, until he began to protest safety violations at work.
(Union Exhibit 9A and 9B) Thereafter, due to his insistence on maintaining safe working
conditions, management characterized him as "disruptive" and the relationship was rocky. The
Grievant testified that management treated him and his shop stewards with a lack of respect and
courtesy and he received threats from some hourly employees who were "pitted against" him by
management. (Union Exhibit 8) He was not re-elected to Union office. Until 1988, he wore
special stockings and his own expensive ($350.00) work boots with a leather upper, hard toe and
electrical resistance. In 1998, the Inspector General investigated safety issues raised much
earlier by the Grievant. Many of these issues concerned improper use of asbestos by supervisors.
As a result, some managers and supervisors were sanctioned and demoted.

6

The Grievant testified that as a result, the night shift at Atlantic Avenue was ended, and in September 1999, he moved to days at the Locust Avenue work location where Mr. Fonseca said, "You radicals caused the trouble in Brooklyn but will not do that here." The Grievant testified that the blame for the I.G. investigation and consequences thereafter were placed on "Gorrick and his associates" and he was threatened by some hourly employees and tried to get police protection. In October 1999, there was no size 16 work boots in the shoe truck and the Grievant said, "Here are my legs." The guy in the truck said, "Wear oxfords," referring to the TA-issued safety boots supplied to managers and supervisors under TS 6.50. Mr. Fonseca and the Grievant obtained approval for him to wear the oxfords and he did so from October to mid-November 1999. His ankles became blistered and ulcerated. He was in great pain with open sores and forced to take barbiturates. (Union Exhibit 7) His physician was very angry and would not let him wear the oxfords or go to work for 45 days. When he returned to work wearing his old shoes from nine years ago, he cleared the medical examination.

The Grievant testified that when the night shift was resumed on Atlantic Avenue, he returned to work there in March 2000 under Mr. Rodney who asked if he had TA-issued work shoes. The Grievant explained the medical reason he could not wear them. Mr. Rodney suspended him and sent him to Labor Relations where Pete Angolio told him to get a doctor's note that the oxfords caused injuries. The Grievant obtained a doctor's note dated March 14, 2000 and received sick leave for the time. On March 20, he took the note to the medical department and asked if he would be allowed to wear his own shoes. The next day, Mr. Rivera told him to buy shoes that met the safety specifications. The Grievant purchased hard –toed shoes, similar to the ones he wore for nine years and Mr. Rodney said they were unacceptable because the shoes did not have steel toes. The Grievant tried, but could not find, a light shoe with the proper toe protection. In May 2000, he had a hearing on prior charges involving

7

dismissal. The Authority offered him, and he accepted a 15-day suspension to settle the charges
and the safety boots charge was withdrawn. From May to October 9, 2000, he worked without
shoe problems until the meeting in Mr. Valenti's office. In attendance was Supervisor Jimmy
Lee who treated hourly employees very badly and was bitter towards the Grievant due to the I.G.
investigation. Mr. Lee threatened, "You will all pay for the I.G. investigation."

   ·    Mr. John Alvarez and Mr. Duncan Findlayter, Power Cable Maintainers, corroborated the
Grievant's testimony with respect to his role in the I.G. investigation, the subsequent harassment
of him by management, and the break-up of the night shift because they were "trouble-makers."
(Union Exhibits 1 and 2; Authority Exhibits 5 and 6) The parties stipulated that Messrs.
Thomas Matthews, Harry Joseph and Fitz Moussignac, Power Cable Maintainers, would have
testified similarly.

POSITIONS OF THE PARTIES

       The Authority argued that the charges were proven and dismissal was warranted because
the Grievant repeatedly refused to wear safety boots in violation of the Authority's safety rules
and regulations. The Authority asserted that the safety shoe policy applied to all employees and
was reasonably related to safety issues. The Authority contended that the Grievant was afforded
ample time, on more than one occasion, to obtain the proper shoes, with or without Authority
assistance. The Authority argued, further, that the evidence did not support the Union's claim of
anti-union animus or that the Grievant was singled out for unfair and retaliatory treatment
because he engaged in union activities.

       The Union argued that dismissal was not warranted under the contract because the
Grievant did not refuse to wear safety shoes. The Union maintained that the Authority knew of
the Grievant's medical condition before he was hired in 1991 and that he was suspended unfairly
for a medical condition. The Union contended that the Authority agreed to his old shoes in May

2000 when the prior set of charges was settled. In the Union's view, the Authority treated the Grievant poorly when it failed to find him another job or send him for a disability determination and chose, instead, to suspend and dismiss him for his medical condition. The Union also argued that its witnesses and one of the Authority's witnesses testified that the Grievant was singled out because he was a "radical" and subjected to retaliation for his union activities, most notably, those in connection with the I. G. investigation. As a remedy, the Union demands reinstatement, a make whole remedy, and an order that the Grievant will never be supervised again by Mr. Lee.

## OPINION

After careful consideration of the all the evidence and argument presented, a majority of the Board concludes that the recommended penalty of dismissal shall be modified to a suspension to date.

In so concluding, we note that the Authority's safety shoe rules and regulations are reasonable and have not been questioned in this case. All employees, including the Grievant, are subject to these rules and regulations.

Likewise, we find that the Grievant has shown, through his testimony and medical documentation, that he has a serious vascular problem in his legs and feet. This medical issue must be addressed by the Authority's medical unit and any specialists to whom the Grievant is referred. We recommend that when visiting a specialist, the Grievant bring a copy of the safety shoe specifications in Authority Exhibit 1 so the specialist can comment on whether the Grievant can wear such shoes comfortably and without worsening his condition.

Under the circumstances of this case, we direct the Grievant to report to Mr. Rivera and the Medical Unit so all may cooperate in obtaining a diagnosis and prognosis about his condition generally, and specifically, whether he is able medically to wear the prescribed safety

9

shoes. If a vascular specialist agrees that he can wear safety boots, we direct that Mr. Rivera and the Grievant work together in good faith to find a safety boot (together with stockings) that will meet the Authority's specifications and will cause the Grievant no pain.

We emphasize that there is no need for Mr. Gorrick to tolerate any discomfort or pain in this process, much less wear uncomfortable shoes to the point of causing ulcerated ankles. If a specialist finds that he cannot wear safety boots as a medical matter, the parties are directed to discuss the possibilities of a different job for the Grievant, one that does not require safety shoes, or placement on disability.

A majority of the Board finds that the evidence does not establish that with respect to the safety shoe issue, the Grievant was subject to discrimination due to his union activities. The application of the safety shoe rule was, and is, for the safety of the Grievant, as it is for all employees. Given the nature of his vascular problem, protection of the Grievant's feet and toes is a primary concern. In light of the Grievant's length of service and other mitigating factors, the recommended dismissal shall be modified to a suspension to date.

In view of the foregoing, we issue the following

10

## AWARD

Mr. Gorrick has been unprepared for work since October 9, 2000 because he did not report for work with authorized safety boots, as required. The recommended penalty of dismissal shall be modified to a suspension to date.

*Margaret Leibowitz*

Margaret Leibowitz
Impartial Chairperson

Dated: April     , 2002

State of New York     )
County of New York  ) ss:

I, Margaret Leibowitz, do hereby affirm upon my oath of arbitrator that I am the individual described in and who executed this instrument, which is my Opinion and Award.

*Margaret Leibowitz*